**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**


VOLUMETRICS MEDICAL IMAGING, LLC,  )
                                        )
               Plaintiff,      )
                                          )
            v.              )          1:05CV955
                                          )
TOSHIBA AMERICA MEDICAL SYSTEMS,  )
INC. and SIEMENS MEDICAL SOLUTIONS )
USA, INC.,                          )
                                          )
              Defendants.    )


## MEMORANDUM OPINION AND ORDER

This matter comes before the Court pursuant to two Motions to Compel filed by Defendant Siemens Medical Solutions USA, Inc. ("Siemens") (Docket Entries 361, 398), seeking production by Plaintiff Volumetrics Medical Imaging, LLC ("VMI") of VMI's settlement agreements with former Defendants in this case, i.e., various "GE" entities and Medison America, Inc. ("Medison"). In addition, Toshiba America Medical Systems, Inc. ("Toshiba") has filed a document styled as its "Joinder in Siemens' Motions to Compel Production of VMI's Settlement and License Agreements with Former Defendants GE and Medison" (Docket Entry 418). Because VMI has not shown that the requested settlement agreements lack relevance as to damages or that the disclosure of said agreements would impose a disproportionate or otherwise undue burden, the Court will grant Siemens's Motions to Compel. However, to the extent Toshiba's "Joinder" filing constitutes a motion (perhaps seeking an order directing VMI to disclose the settlement agreements in question to Toshiba), the Court will deny any relief.

## I.  BACKGROUND

VMI brought the instant patent infringement action against Siemens, Toshiba, various GE entities, and Medison. (<u>See</u> Docket Entries 1, 262.)  The underlying patents "concern diagnostic ultrasound machines and associated methods for acquiring and displaying images of the human body, in real time and in both two and three dimensions."  (Docket Entry 262, ¶ 1.)  Allegedly, "[t]hese technologies represent a significant advance in the field of diagnostic imaging, as they permit physicians to view the human body with a degree of spatial detail and clarity never before achieved by any other form of imaging."  (<u>Id.</u>)

As part of discovery in this case, Siemens requested from VMI "[a]ll documents relating to any legal proceeding involving VMI, including . . . <u>settlement agreements</u>," as well as "[a]ll documents relating to any <u>license agreement</u> . . . <u>or other agreement</u> relating to ultrasound technology or any of the VMI patents" and "[a]ll <u>license agreements</u> . . . <u>or other agreements</u> granting any right relating to any VMI Patent or VMI Patent Application, between VMI and any other person or entity."  (Docket Entry 362, Ex. A at 6-7 (emphasis added).)  During the pendency of this case, the various GE entities and Medison reached settlements with VMI that resulted in their dismissals as Defendants.  (<u>See</u> Docket Entries 360, 392.)[1] Following those settlements, Siemens moved to compel VMI to produce the underlying settlement agreements, on the grounds that each

---

[1] In light of those settlements, the Court has included only the names of Toshiba and Siemens in the "Defendants" portion of the caption for this Order.

"requested agreement grants a license to the patents-in-suit and is thus one of the key documents in this case rebutting VMI's validity and damages assertions." (Docket Entry 361 at 1; Docket Entry 398 at 1.) VMI opposed those Motions to Compel. (Docket Entries 363, 402.) Toshiba thereafter filed its instant "Joinder in Siemens' Motions to Compel Production of VMI's Settlement and License Agreements with Former Defendants GE and Medison" (Docket Entry 418), to which VMI responded (Docket Entry 422).

## II.  DISCUSSION

### A.  Identification of Pertinent Discovery Rules

"The purpose of discovery is to provide a mechanism for making relevant information available to the litigants." Fed. R. Civ. P. 26 advisory committee's notes, 1983 Amendment (emphasis added). Accordingly, under the Federal Rules of Civil Procedure (the "Rules"), "[u]nless otherwise limited by court order, . . . [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1) (emphasis added).[2] "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id.

---

[2] Prior to December 1, 2000, said provision permitted "discovery regarding any matter, not privileged, which is relevant to the subject matter in the pending action," Fed. R. Civ. P. 26(b)(1) (1993) (emphasis added). That language was altered in response to concerns that, "in some instances, particularly cases involving large quantities of discovery, parties [were] seek[ing] to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the 'subject matter' involved in the action." Fed. R. Civ. P. 26 advisory committee's notes, 2000 Amendment, Subdivision (b)(1). In order to secure discovery as to the "subject matter" of an action, a party now must obtain court authorization by showing "good cause." Fed. R. Civ. P. 26(b)(1).

-3-

Moreover, the commentary to the Rules indicates that "[a] variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action. For example, other incidents of the same type, or involving the same product, could be properly discoverable under the [governing] standard." Fed. R. Civ. P. 26 advisory committee's notes, 2000 Amendment, Subdivision (b)(1).

At the same time, however, "[a]ll discovery is subject to the limitations imposed by Rule 26(b)(2)(C)." Fed. R. Civ. P. 26(b)(1). That cross-referenced provision limits discovery to the extent:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) <u>the burden</u> or expense <u>of the proposed discovery outweighs its likely benefit</u>, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C) (emphasis added). In addition, a "court may, <u>for good cause</u>, issue an order to <u>protect a party</u> or person from annoyance, embarrassment, oppression, or <u>from undue burden</u> or expense, including . . . forbidding . . . discovery [or] . . . inquiry into certain matters . . . ." Fed. R. Civ. P. 26(c)(1) (emphasis added).

-4-

Siemens has moved to compel VMI to comply with Siemens's above-quoted document requests, see supra, p. 2, by producing VMI's settlement agreements with the GE entities and Medison. (Docket Entries 361, 398.)[3] In opposition, VMI has asserted that "the private agreement between VMI and GE to settle this litigation is not relevant to any substantive claims or defenses in this case." (Docket Entry 363 at 2.) Instead, according to VMI, "Siemens' motion [to compel production of said agreement] is an attempt to gain a tactical advantage." (Id. at 8.) Similarly, VMI has stated that "the confidential settlement agreement between VMI and Medison is neither relevant to any claims or issues presented in this case nor calculated to lead to the discovery of any relevant, admissible evidence. Rather, Siemens' [motion to compel production of said agreement] is an attempt to gain a tactical advantage . . . ." (Docket Entry 402 at 11 (internal dash omitted).) VMI has identified the "tactical advantage" Siemens allegedly improperly seeks to procure as follows: "obtaining information that might impact [Siemens's] negotiating position for any settlement with VMI" (Docket Entry 363 at 8; accord Docket Entry 402 at 10).

Accordingly, to resolve Siemens's instant Motions to Compel:

1) the Court must assess the relevance of the requested settlement agreements to issues in this case (including, in pertinent part, damages), see Fed. R. Civ. P. 26(b)(1); and

---

[3] "A party seeking discovery may move for an order compelling an answer, designation, production, or inspection." Fed. R. Civ. P. 37(a)(3)(B). The closing of discovery did not affect Siemens's right in this regard, because VMI remains under an ongoing duty to supplement its discovery responses, see Fed. R. Civ. P. 26(e)(1).

2) if lack of relevance does not bar disclosure of the requested settlement agreements, the Court must consider whether the burden imposed upon VMI by such disclosure outweighs the legitimate benefits of such disclosure or whether the burden on VMI resulting from such disclosure otherwise qualifies as undue, <u>see</u> Fed. R. Civ. P. 26(b)(1), (b)(2)(C), and (c)(1).

## B.  Resolution of Choice of Law Issues

Because this case involves alleged patent infringement, before undertaking the foregoing tasks, the Court first must determine whether and to what extent it must look to the precedent of the United States Court of Appeals for the Federal Circuit (rather than of the United States Court of Appeals for the Fourth Circuit).  <u>See generally</u> <u>Hanamint Corp., Inc. v. Alliant Mktg. Group, LLC</u>, 481 F. Supp. 2d 444, 449 (M.D.N.C. 2007) (Beaty, C.J.) (observing that Federal Circuit authority governs "issues intimately related to substantive patent law" (internal quotation marks omitted)).  As a general rule, regional circuit law applies "when the issue involves an interpretation of the Federal Rules of Civil Procedure. However, . . . Federal Circuit law applies to discovery matters if the determination implicates an issue of substantive patent law." <u>In re Deutsche Bank Trust Co. Amers.</u>, 605 F.3d 1373, 1377 (Fed. Cir. 2010) (internal citations and quotation marks omitted).  In other words, "Federal Circuit law applies when deciding whether particular written or other materials are discoverable in a patent case, if those materials relate to an issue of substantive patent

-6-

law." <u>Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.</u>, 265

F.3d 1294, 1307 (Fed. Cir. 2001).[4]

In <u>Advanced Cardiovascular</u>, the Federal Circuit ruled that its

jurisprudence would apply to the question of whether "negotiations

surrounding [a] settlement agreement between [the plaintiff] and [a

third-party]" were relevant to the defendant's assertions of

inequitable conduct by the plaintiff (because those assertions

involved matters of substantive patent law). <u>See id.</u> at 1307-08.

In this case, the Court similarly must evaluate the relevance of

the requested settlement agreements to issues bound up with

substantive patent law, such as VMI's "damages assertions" (Docket

Entry 361 at 1; Docket Entry 398 at 1). The Court therefore will

look to Federal Circuit law in conducting its relevance analysis.

In particular, the Court will apply the Federal Circuit's standard

that "[r]elevance under Rule 26(b)(1) is construed more broadly for

discovery than for trial." <u>Truswal Sys. Corp. v. Hydro-Air Eng'q,</u>

<u>Inc.</u>, 813 F.2d 1207, 1211 (Fed. Cir. 1987). <u>See also</u> <u>Murata Mfg.</u>

_____

[4] The Federal Circuit's view in this regard appears to have emerged no
later than 1987. <u>Compare</u> <u>Heat & Control, Inc. v. Hester Indus., Inc.</u>, 785 F.2d
1017, 1022-26 & n.4 (Fed. Cir. 1986) (describing review of order quashing
subpoena as involving "questions relating solely to procedural matters . . . that
do not directly address issues of patent law," such that Federal Circuit would
"follow the law of the regional circuit" and making clear that its ruling
represented prediction about position regional circuit would take,
notwithstanding fact that its analysis included determination that "information
sought [by subpoena] appears to be highly relevant to [underlying] infringement
action"), <u>with</u> <u>Truswal Sys. Corp. v. Hydro-Air Eng'q, Inc.</u>, 813 F.2d 1207, 1209-
12 (Fed. Cir. 1987) (observing that, because "order quashing a subpoena is not
unique to patent law . . ., [Federal Circuit] would normally apply the law of the
Eighth Circuit [wherein district court that issued order lied] to the merits of
the order," but declaring that, because "determination of relevance implicates
the substantive law of patent validity and infringement . . ., [it would] look
to Federal Circuit law, as opposed to that of the Eighth Circuit, in assessing
relevance [of subpoenaed information]").

Co., Ltd. v. Bel Fuse, Inc., 422 F. Supp. 2d 934, 945 (N.D. Ill. 2006) ("Patent infringement cases are not exceptions to the rule that discovery is liberal and relevancy is broadly construed.").

Although Federal Circuit law controls the core relevance review in this case, a further question exists about where the Court should look for guidance regarding the more procedural aspects of its analysis of Siemens's instant Motions. In general, a district court "shall review procedural matters, that are not unique to patent issues, under the law of the particular regional circuit court where appeals from the district court would normally lie." Panduit Corp. v. All States Plastic Mfg. Co., Inc., 744 F.2d 1564, 1574-75 (Fed. Cir. 1984). However, "in some instances it has not been obvious whether a particular issue should be characterized as a 'patent' issue or not." Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1359 (Fed. Cir. 1999). One such issue concerns the allocation of the burden of persuasion as to relevance, i.e., does Siemens (as the party seeking disclosure) bear the burden of proving that the requested settlement agreements have relevance to issues in this case or must VMI (as the party resisting disclosure) show a lack of relevance (and/or disproportionate or otherwise undue burden)?

The Court found no authority (from the Federal Circuit or elsewhere) directly confronting this question. However, numerous courts adjudicating discovery disputes in patent cases appear to have assumed that they should allocate such burdens in the same manner as courts in their respective circuits have done in non-

-8-

patent cases. See, e.g., Jardin v. DATAllegro, Inc., No. 11-CV-87-IEG(WVG), 2011 WL 1769835, at *2 (S.D. Cal. May 9, 2011) (unpublished); BIAX Corp. v. NVIDIA Corp., No. 09-CV-01257-PAB-MEH, 2010 WL 4038728, at *3 (D. Colo. Oct. 14, 2010) (unpublished); Lamourex v. Genesis Pharmacy Servs., Inc., 226 F.R.D. 154, 159 (D. Conn. 2004). That fact – combined with the Court's own considered view that the issue of who bears the burden of persuasion regarding relevance (and other limits on discovery) represents a purely "procedural" matter (rather than a matter intimately connected to substantive patent law) – convinces the Court that it need not attempt to discern the Federal Circuit's position on this question. Instead, the Court will allocate the burden of persuasion as to the discovery dispute in this case in the same manner that district courts within the Fourth Circuit have done in non-patent cases (which, in the Court's view, reflects the best forecast of the discovery burden-allocation rule the Fourth Circuit would choose).

Specifically, the Court adopts the view consistently taken by district judges and magistrate judges throughout the Fourth Circuit (including members of this Court) over five decades, i.e., that the party resisting discovery (including on relevance grounds), not the party moving to compel discovery, bears the burden of persuasion. See, e.g., Clere v. GC Servs., L.P., No. 3:10CV00795, 2011 WL 2181176, at *2 (S.D.W. Va. June 3, 2011) (unpublished) ("The party resisting discovery bears the burden of showing why it should not be granted."); Cappetta v. GC Servs. Ltd., No. 3:08CV288, 2008 WL 5377934, at *2 (E.D. Va. Dec. 24, 2008) (unpublished) ("The burden

is on the party resisting production to show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each interrogatory is not relevant." (internal quotation marks omitted)); <u>United Oil Co., Inc. v. Parts Assocs., Inc.</u>, 227 F.R.D. 404, 411 (D. Md. 2005) ("Generally, the burden is on the party resisting discovery to clarify and explain precisely why its objections are proper given the broad and liberal construction of the federal discovery rules. This includes, of course, where the resisting party asserts that the discovery is irrelevant."); <u>Elkins v. Broome</u>, No. 1:02CV305, 2004 WL 3249257, at *2 (M.D.N.C. Jan. 12, 2004)(unpublished)(Dixon, M.J.) ("It is the rule in federal court that the burden is on the party resisting discovery on relevancy grounds to support his objection; it is not the party's burden propounding discovery, at least in the first instance, to show relevancy."); <u>Spell v. McDaniel</u>, 591 F. Supp. 1090, 1114 (E.D.N.C. 1984) ("[T]he burden of showing that the requested discovery is not relevant to the issues in this litigation is clearly on the party resisting discovery."); <u>Flora v. Hamilton</u>, 81 F.R.D. 576, 578 (M.D.N.C. 1978)(Gordon, C.J.) ("[T]he burden of showing that the requested discovery is not relevant to the issues in the case is on the party resisting discovery."); <u>Rogers v. Tri-State Materials Corp.</u>, 51 F.R.D. 234, 247 (N.D.W. Va. 1970)("The burden is upon the objecting party to show that her objections to the interrogatories should be sustained."); <u>Pressley v. Boehlke</u>, 33 F.R.D. 316, 318 (W.D.N.C. 1963) ("[T]he burden is on

defendant to show his objections to interrogatories should be sustained.").[5]

### C. Application of Pertinent Discovery Rules to Disclosure of Requested Settlement Agreements in Light of Choice of Law

#### 1. VMI Has Not Shown that the Requested Settlement Agreements Lack Relevance to Damages

Siemens's instant Motions to Compel declare that VMI's settlement agreements with the GE entities and Medison have relevance to the issue of damages. (See Docket Entry 361 at 1; Docket Entry 398 at 1.) VMI disagrees. (See Docket Entry 363 at 6-7; Docket Entry 402 at 4-7.) To resolve this disagreement, the Court first must identify the methodology for proving damages in patent infringement cases (as dictated by authority from the Federal Circuit, see supra, pp. 6-8, and – of course – the United States Supreme Court) and then must determine whether, given that damages regime, VMI has shown that the requested settlement agreements lack relevance under Rule 26(b)(1), see supra, pp. 8-11 & n.5. The Court ultimately concludes that, particularly in light of ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860 (Fed. Cir. 2010), VMI has not carried its burden in this regard.

---

[5] VMI contends that it should not have to bear this burden, but instead "Siemens should be required to make a heightened showing of need in order to overcome the public policy favoring settlement and settlement confidentiality." (Docket Entry 363 at 2 n.1.; accord Docket Entry 402 at 8 n.2.) "[A] variety of courts have recognized a 'settlement privilege,' . . . [but] [m]any have not. The Fourth Circuit has never recognized a settlement privilege or required a particularized showing in the context of a subpoena for confidential settlement documents. Nor can the court find any statute or rule excepting a confidential settlement agreement from Rule 26(b)(1)." Polston v. Eli Lilly & Co., C/A No. 3:08-3639, 2010 WL 2926159, at *1 (D.S.C. July 23, 2010) (unpublished) (internal citations omitted). Accordingly, this Court, like the Polston Court, declines to impose any special form of burden on a party seeking disclosure of settlement agreements. See id.

<u>a. Standards for Proving Patent Infringement Damages</u>

"Upon a showing of infringement, a patentee is entitled to 'damages adequate to compensate for the infringement, but in no event less than a <u>reasonable royalty</u> for the use made of the invention by the infringer.'" <u>Id.</u> at 868 (quoting 35 U.S.C. § 284) (emphasis added). "There are two methods by which damages may be calculated under this statute. If the record permits the determination of actual damages, namely, the profits the patentee lost from the infringement, that determination accurately measures the patentee's loss. If actual damages cannot be ascertained, then a <u>reasonable royalty</u> must be determined." <u>Hanson v. Alpine Valley Ski Area, Inc.</u>, 718 F.2d 1075, 1078 (Fed. Cir. 1983) (emphasis added). "A reasonable royalty can be calculated from an <u>established royalty</u>, the infringer's <u>profit projections</u> for infringing sales, or a <u>hypothetical negotiation</u> between the patentee and infringer based on the factors in <u>Georgia-Pacific Corp. v. U.S. Plywood Corp.</u>, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)." <u>Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.</u>, 609 F.3d 1308, 1319 (Fed. Cir. 2010).

The first of these three alternative bases for identifying a "reasonable royalty," i.e., "an 'established royalty,'" <u>id.</u>, arises "where there has been such a number of sales by a patentee of licenses to make, use, and sell his patents as to <u>establish</u> a <u>regular price</u> for a license . . . ." <u>Rude v. Wescott</u>, 130 U.S. 152, 165 (1889) (emphasis added); <u>see also</u> <u>Mahurkar v. C.R. Bard, Inc.</u>, 79 F.3d 1572, 1579 (Fed. Cir. 1996) (observing that proof of

"established royalty" requires "evidence of royalties in the marketplace"). "Where an <u>established royalty</u> exists, it will usually be the best measure of what is a <u>'reasonable' royalty</u>." <u>Nickson Indus., Inc. v. Rol Mfg. Co., Ltd.</u>, 847 F.2d 795, 798 (Fed. Cir. 1988) (emphasis added). In the absence either of an "established royalty" or of adequate "profit projections" (the second option for showing a "reasonable royalty" identified in <u>Wordtech Sys.</u>), the third "approach, called the hypothetical negotiation or the 'willing licensor-willing licensee' approach, attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." <u>Lucent Techs., Inc. v. Gateway, Inc.</u>, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

As noted above, <u>see</u> <u>supra</u>, p. 12, the Federal Circuit has held that, in applying this "hypothetical negotiation" approach, courts should look to "the factors in <u>Georgia-Pacific</u>." <u>Wordtech Sys.,</u> 609 F.3d at 1319 (internal citation omitted). "The first <u>Georgia-Pacific</u> factor requires considering past and present royalties received by the patentee 'for the licensing of the patent in suit, proving or tending to prove an established royalty.'" <u>ResQNet.com</u>, 594 F.3d at 869 (quoting <u>Georgia-Pacific</u>, 318 F. Supp. at 1120) (internal emphasis omitted). The other 14 factors listed in <u>Georgia-Pacific</u> include consideration of:

1) whether the patentee had an "established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special

conditions designed to preserve that monopoly," <u>Georgia-Pacific</u>, 318 F. Supp. at 1120 ("Factor 4");

2) "[t]he portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions," <u>id.</u> ("Factor 12");

3) "[t]he opinion testimony of qualified experts," <u>id.</u> ("Factor 14"); and

4) "[t]he amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee - who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license," <u>id.</u> ("Factor 15").

<u>b. VMI's Argument that Settlement Licenses Lack Relevance to a Reasonable Royalty Finds No Support in Controlling Precedent</u>

According to VMI, the Court should decline to compel production to Siemens of VMI's settlement agreements with the GE entities and Medison, because "[a]greements reached to resolve patent litigation are <u>not relevant to the calculation of a reasonable royalty</u>." (Docket Entry 363 at 6 (emphasis added); <u>accord</u> Docket Entry 402 at 4.) In support of this assertion, VMI provided the following citation:

> *See, e.g.*, *Hanson*, 718 F.2d at 1078-79; *Rude*, 130 U.S. at
> 164; *see also Deere & Co. v. International Harvester Co.*,
> 710 F.2d 1551, 1554 (Fed. Cir. 1983) (affirming district
> court's holding that a license negotiated to resolve a
> previous lawsuit was "irrelevant [in] determining either
> an established royalty rate or a reasonable royalty, and,
> in fact, was inadmissible under Rule 408, Federal Rules
> of Evidence").

(Docket Entry 363 at 6; <u>accord</u> Docket Entry 402 at 4-5 (quoting

from <u>Rude</u> and <u>Hanson</u>).)   These cited cases do not support VMI's

sweeping pronouncement regarding the purported irrelevance of

settlement agreements to the calculation of a "reasonable royalty."

<u>i.  Rude Does Not Support VMI's Position</u>

In the earliest of these cases, the Supreme Court ruled that

the plaintiff-patent-owners had not presented sufficient evidence

"for the recovery of specific damages for the alleged infringement

of [their horse-drawn seeding-machine] patents . . . [and

therefore] direct[ed] [the trial court] to enter a decree for the

[plaintiff-patent-owners] for nominal damages[.]" <u>Rude</u>, 130 U.S.

at 167.   In reaching that conclusion, the Supreme Court reviewed

the report of the special master (whom the trial court had

commissioned to make findings as to damages following a

determination of infringement and validity). <u>See id.</u> at 163.   The

special master determined that the plaintiff-patent-owners "waived

all claim for profits arising from the manufacture, use, and sale

of the patented machines, and relied upon the proofs as

establishing such a <u>fixed royalty or license fee</u> as would furnish

a criterion by which to estimate [the] damages[.]" <u>Id.</u> (emphasis

added).   More specifically, the special master "found from two

instances, and perhaps a third instance, in which a specified sum

-15-

had been paid for the use of the [patented] machines, or for the privilege of making and selling them, that the [plaintiff-patent-owners] had suffered damages on each one-horse machine used by the defendants of one dollar, and on each two-horse machine used by them of two dollars." Id. at 163-64.

The Supreme Court then described the three previous payment scenarios on which the special master had relied in finding that a "fixed royalty" existed as to the patented machines. See id. at 164-65. In so doing, it took note that one of the three prior payment arrangements "was made in part under a threat of suit, and in part as the result of an arbitration after litigation on the subject had been commenced, and to avoid future litigation." Id. at 164. The Supreme Court thereafter observed as follows:

> It is clear that a payment of any sum in settlement of a claim for an alleged infringement cannot be taken as a standard to measure the value of the improvements patented, in determining the damages sustained by the owners of the patent in other cases of infringement. Many considerations other than the value of the improvements patented may induce the payment in such cases. The avoidance of the risk and expense of litigation will always be a potential motive for a settlement.

Id. (emphasis added).

After reviewing the other two instances which the special master had credited as establishing a "fixed royalty," the Supreme Court acknowledged "that where there has been such a number of sales by a patentee of licenses to make, use, and sell his patents as to establish a regular price for a license, that price may be taken as a measure of damages against infringers." Id. at 165 (emphasis added). However, the Supreme Court stated that, "[l]ike

-16-

sales of ordinary goods, [sales of licenses] must be common, that
is of frequent occurrence, to establish such a <u>market price</u> for the
article that it may be assumed to express, with reference to all
similar articles, their salable value at the place designated."
<u>Id.</u> (emphasis added). Accordingly, the Supreme Court declared:

> In order that a royalty may be <u>accepted as a measure of</u>
> <u>damages</u> against an infringer, who is a stranger to the
> license establishing it, it must be paid or secured
> before the infringement complained of; it must be paid by
> such a number of persons as to indicate a general
> acquiescence in its reasonableness by those who have
> occasion to use the invention; and it must be uniform at
> the places where the licenses are issued. Tested by
> these conditions, the sums paid in the instances
> mentioned, upon which the master relied, cannot be
> regarded as evidence of the value to the defendants of
> the invention patented.

<u>Id.</u> (emphasis added).

The trial court similarly had concluded that the three prior
payment arrangements did not establish a "fixed royalty" and had
"remanded the case to the master to take further evidence. [The
special master] did so, but in his second report he stated that the
additional evidence did not strengthen the proofs previously made
in support of the claim that [the plaintiff-patent-owners] had
<u>established a license fee or royalty</u> which furnished a criterion by
which to estimate the damages." <u>Id.</u> (emphasis added). Further,
although the special master "took the opinions of different persons
on the subject [of the value the defendants had derived by
infringing on the patented machines]," <u>id.</u> at 165-66, "[t]he
estimates of all the witnesses of the [plaintiff-patent-owners]
were merely conjectural; that is, were made without having
knowledge of any saving secured either in the cost of the machine

-17-

or in the labor required for its use," <u>id.</u> at 166, and "witnesses produced by the defendants . . . stated that they did not consider [the patented seeding-machines] of any more utility than other seeding drills in use, and that they did not bring any greater price in the market," <u>id.</u>

The special master apparently declined to give "weight to the judgment of any of the witnesses, but concluded . . . [without explanation] that 75 cents on each two-horse [seeding-machine unlawfully made, used, and sold by the defendants], and double that sum on each [such] two-horse [seeding-machine], would be the proper amount to allow [as a measure of damages]." <u>Id.</u> Because the special master determined "that there were 1,000 one-horse [seeding-machines unlawfully made, used, and sold by the defendants], and an equal number of [such] two-horse [seeding-machines], he reported that the [plaintiff-patent-owners] were entitled to $2,250 as damages." <u>Id.</u> "The [trial] court was not satisfied with [the special master's] conclusion, and, without stating the ground of its action, ordered the amount to be reduced to $1,800 as damages . . . ." <u>Id.</u>

Given these circumstances, the Supreme Court held that "[t]he action of the [trial] court [wa]s subject to the same objection as the report of the master. The ruling that a <u>royalty was established</u>, as made in the first report, had been repudiated by [the trial court], and no evidence of the value of the invention to the defendants was adduced except the conjectural estimates stated; and they furnished no satisfactory basis for any damages . . . ."

_Id._ at 166-67 (emphasis added).  As a result, the Supreme Court concluded that the trial court's damage award violated the "settled rule of law . . . that actual, not speculative, damages must be shown, and by clear and definite proof, to warrant a recovery for the infringement of a patent."  _Id._ at 167; see also _Cornely v. Marckwald_, 131 U.S. 159, 161 (1889) (characterizing _Rude_'s statements about royalty rates arising from litigation as relating to "question of an _established_ license fee" (emphasis added)).

As the foregoing discussion shows, the Supreme Court did not render in _Rude_ a ruling about whether a litigant might ever rely on a royalty rate adopted in a settlement as evidence relevant to the "hypothetical negotiation" method of proving a "reasonable royalty."  Rather, the _Rude_ Court ruled insufficient:

1) the plaintiff-patent-owners' showing of an "established royalty" (primarily, if not totally, for reasons other than that one of the prior royalty payments cited by the special master arose from litigation, e.g., because the number of prior royalty payments was too small and the amount of such payments was not uniform); and

2) the special master's reliance on uninformed speculation as a method of showing the value of an invention to an infringer.

Accordingly, to the extent the Supreme Court's comments about royalties arising from litigation represented part of the holding in _Rude_, those remarks do not resolve the question presented by Siemens's instant Motions to Compel (i.e., whether royalties paid in connection with a settlement may have relevance to the calculation of a "reasonable royalty" under the "hypothetical

-19-

negotiation" approach).[6]  Indeed, at the time of the Supreme
Court's decision in Rude (i.e., 1889), the very concept of a
"reasonable royalty" as an alternative to proof of damages via
evidence of lost profits or of an "established royalty" had not
achieved acceptance; rather, the Supreme Court only embraced the
"reasonable royalty" approach in 1915.  See Dowagiac Mfg. Co. v.
Minnesota Moline Plow Co., 235 U.S. 641, 647-51 (1915); see also
Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1566 (Fed. Cir.
1995) (Nies, J., dissenting in part) ("[I]n Dowagiac Mfg. Co., the
Supreme Court endorsed the theory of a hypothetical reasonable
royalty as 'damages' where the patentee could not prove actual
damages.  This relief had been developed in several lower courts
because of the unfairness to the patentee who, despite
infringement, received only nominal damages.  Where actual damages
in the form of recoupment of a patentee's 'lost profits' or the
amount of an established royalty could not be proved, the Dowagiac
Court held that the patentee 'was entitled to prove what would have
been a reasonable royalty.' . . .  Congress gave its specific
approval to a reasonable royalty as statutory 'damages' by
enactment of the provision, 'general damages . . . not less than a
reasonable royalty.'" (internal citations omitted) (ellipses in
original) (quoting Dowagiac Mfg., 235 U.S. at 650, and 35 U.S.C.
§ 284 (1946), respectively)); Merrell Soule Co. v. Powdered Milk

---

[6] Other courts have reached the same conclusion.  See, e.g., Sunstar, Inc.
v. Alberto-Culver Co., Inc., Nos. 01C0736, 01C5825, 2004 WL 1899927, at *30 (N.D.
Ill. Aug. 23, 2004) (unpublished) ("The Court does not interpret Rude as
prohibiting the introduction of licenses or offers to license made after
litigation or threat of litigation on the issue of a reasonable royalty.").

Co. of Am., 7 F.2d 297, 299 (2d Cir. 1925) (agreeing with view that Dowagiac Mfg. "settl[ed] the [later statutorily] mooted question as to whether a reasonable royalty may be allowed, and [laid] down a more liberal rule, to be applied with caution").

### ii.  Hanson and Deere Do Not Support VMI's Position

The portions of the two Federal Circuit decisions cited by VMI (i.e., Hanson, 718 F.2d at 1078-79, and Deere, 710 F.2d at 1554) similarly fail to bolster VMI's contention that "[a]greements reached to resolve patent litigation are not relevant to the calculation of a reasonable royalty" (Docket Entry 363 at 6; accord Docket Entry 402 at 4-5).  Moreover, Deere actually supports the contrary view.

In the section of Hanson identified by VMI, the Federal Circuit affirmed the district court's "rul[ing] that the record did not show an established royalty."  Hanson, 718 F.2d at 1078 (emphasis added).  In so doing, the Federal Circuit stated that, "since the offers were made after the infringement had begun and litigation was threatened or probable, their terms should not be considered evidence of an established royalty, since license fees negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation."  Id. at 1078-79 (internal brackets, ellipses, and quotation marks omitted) (emphasis added).  Further, in thereafter addressing the district court's "use [of the] willing-buyer/willing-seller concept, in which a suppositious meeting between the patent owner and the prospective user of the infringing method is held to negotiate a

-21-

license agreement," _id._ at 1079 (internal brackets and quotation marks omitted), the Federal Circuit did not make any statement about the relevance of royalty rates paid in settlement of litigation, _see_ _id._ at 1079-82. In sum, because _Hanson_ addressed the significance of litigation-induced licensing only in connection with the proof of an "established royalty" and not as such licenses might bear (as one of many factors) upon the determination of a "reasonable royalty" via the "hypothetical negotiation" approach, it fails to aid VMI's argument that the requested settlement agreements lack relevance (under Rule 26(b)(1)) to the determination of a "reasonable royalty."

VMI's citation to _Deere_ not only fails to support its position, but also creates a false impression. Specifically, VMI cited _Deere_ as "affirming [the] district court's _holding_ that a license negotiated to resolve a previous lawsuit was 'irrelevant [in] determining either an established royalty rate or a reasonable royalty, and, in fact, was inadmissible under Rule 408, Federal Rules of Evidence[.]'" (Docket Entry 363 at 6 (quoting _Deere_, 710 F.2d at 1554) (first set of brackets in original) (emphasis added).) The partial quotation utilized by VMI in this regard accurately reflects the _Deere_ Court's description (under the heading, "District Court Opinion") of part of the district court's underlying ruling. _See_ _Deere_, 710 F.2d at 1554. However, even a cursory review of the portion of _Deere_ that lies beneath the heading "OPINION" reveals that the Federal Circuit did not endorse

the specific portion of the district court's decision that VMI
chose to quote.  See id. at 1556-59.

As an initial matter, the Federal Circuit expressly held that
the district court erred in treating the prior licensing evidence
at issue in that case as inadmissible under Federal Rule of
Evidence 408.  See id. at 1556-57.[7]  Further, as to relevance, the
Federal Circuit observed that the district court had failed to
distinguish "between evidence of little probative value and
evidence considered not relevant, the latter being inadmissible
under Rule 402, Federal Rules of Evidence."  Id. at 1156.  After

---

[7] VMI has not developed a meaningful argument that the Court should treat
its settlement agreements with the GE entities and Medison as irrelevant for
purposes of discovery under Rule 26(b)(1), because Federal Rule of Evidence 408
would make them inadmissible at trial.  Instead, VMI simply has asserted in
conclusory fashion (based on citations to two district court decisions) that said
evidentiary rule would bar admission of the requested settlement agreements.
(See Docket Entry 363 at 2; Docket Entry 402 at 6-7.)  Even if the Court accepted
VMI's undeveloped, bald assertion that Federal Rule of Evidence 408 would, under
all conceivable circumstances, preclude Siemens's introduction at trial of any
information found in the requested settlement agreements (which the Court
declines to do), that determination would not resolve the issue before the Court.
See, e.g., Phoenix Solutions Inc. v. Wells Fargo Bank, N.A., 254 F.R.D. 568, 584
(N.D. Cal. 2008) ("[Federal] Rule [of Evidence] 408 does not warrant protecting
settlement negotiations from discovery.  On its face, [Federal Rule of Evidence
408] applies to the admissibility of evidence at trial, not to whether evidence
is discoverable.").  Indeed, as set forth above, see supra, p. 3, under Rule
26(b)(1), relevance for discovery purposes does not depend on the admissibility
of the information sought, but requires only the reasonable prospect that the
disclosure in question may lead to the unearthing of admissible evidence.  VMI
concedes this point, but seeks to overcome it with yet another conclusory
declaration, i.e., that Siemens has not "attempt[ed] to demonstrate that the
settlement agreement might lead to admissible evidence."  (Docket Entry 363 at
2.)  VMI's tactic in this regard fails because it, not Siemens, bears the burden
of persuasion on this issue, see supra, pp. 8-11 & n.5.  In other words, VMI:
1) has the onus to show that Siemens lacks any reasonable chance of uncovering
admissible evidence based on the settlement agreements; and 2) cannot accomplish
that task by pointing to Siemens's alleged failure to show what admissible
evidence it might find.  At best, such an approach leaves the matter in equipoise
and VMI, as the party with the burden of persuasion, loses.  See generally Salem
v. Holder, ___ F.3d ___, ___ & n.6, 2011 WL 1998330, at *7 & n.6 (4th Cir. 2011).

carefully scrutinizing the substance of the district court's opinion, the Federal Circuit concluded that, notwithstanding the district court's apparent, occasional loose use of the term "irrelevant," the district court actually treated the evidence regarding other licenses as "relevant" within the meaning of Federal Rule of Evidence 402, but determined that it nonetheless was "of little or no significance to the issues of an established royalty or a reasonable royalty." Id.

In reviewing that determination, the Federal Circuit observed that the district court had cited Rude and a decision from a district court in Arizona "for the proposition that a single license, paid or secured by one, relatively minor competitor after the onset of the complained infringement, may be rejected as a measure of damages." Id. at 1557 (emphasis added).[8] The Federal Circuit accepted that highly qualified (e.g., "single license" from "one relatively minor competitor") – and thus limited – edict as "an accurate statement of the relevant law" and affirmed the district court's application of said standard in that case, "to the extent that the [district] court considered the probative value of the [single license to one relatively minor competitor] to be vanishingly small." Id. Finally, the Federal Circuit upheld the

---

[8] The Court interprets the phrase "measure of damages" as stated in Deere as a reference to the use of a prior license to show an "established royalty" (rather than to the use of a prior license as one piece of evidence among many to prove a "reasonable royalty" via the "hypothetical negotiation" approach). In this regard, the Court notes (as set out above, see supra, p. 17) that the Supreme Court used the same "measure of damages" language in discussing an "established royalty" (at a time before the concept of a "reasonable royalty" emerged, see supra, pp. 20-21).

district court's holding as to the lack of an <u>established royalty</u> in this case" (based on the absence of "evidence indicating a general acceptance within the [relevant] industry of a particular market value for the [subject] patent") and ruled that, because "[a prior] license was negotiated against a backdrop of continuing litigation . . ., the district court could properly <u>discount the probative value</u> of [that prior] license <u>with regard to a reasonable royalty</u>." <u>Id.</u> (emphasis added).

As discussed above as to <u>Rude</u> and <u>Hanson</u>, <u>see</u> <u>supra</u>, pp. 19-22, to the extent <u>Deere</u> addressed the proof necessary to show an "established royalty," it does not resolve the question of whether licenses granted in settlement of litigation have possible relevance to the determination of a "reasonable royalty" under the "hypothetical negotiation" approach. Further, in its treatment of the "reasonable royalty" question in <u>Deere</u>, the Federal Circuit effectively recognized that licenses for a patent in-suit arising from litigation generally do qualify as "relevant" under Federal Rule of Evidence 402, but that, under the particular circumstances of a given case, a district court properly may attribute little weight to such evidence in rendering judgment at trial.

c.  <u>ResQNet.com Confirms That VMI's<br>Relevance Objection Falls Short</u>

Before the decision in <u>ResQNet.com</u>, district courts across the country had divided sharply (and, based on the Court's research, rather evenly) in their assessments (in a variety of procedural contexts) of whether litigation-inspired licensing terms have relevance to the determination of a "reasonable royalty." <u>Compare,</u>

e.g., <u>Phoenix Solutions Inc. v. Wells Fargo Bank, N.A.</u>, 254 F.R.D. 568, 583 (N.D. Cal. 2008) (holding "that, at a minimum, discovery of licensing/settlement negotiations [in which patent-holder offered licenses to third-parties accused of infringement] is reasonably calculated to lead to relevant, admissible evidence"); <u>Sunstar, Inc. v. Alberto-Culver Co., Inc.</u>, Nos. 01C0736, 01C5825, 2004 WL 1899927, at *28-31 (N.D. Ill. Aug. 23, 2004) (unpublished) (denying motion in limine seeking to bar evidence of royalties paid under threat of litigation due to alleged lack of probative value because said concerns "implicate the weight, not the admissibility, of [such agreements]" and ruling that "trier of fact may consider the context in which [agreements] were reached and determine whether the probative value of [such a] license should be discounted"); <u>Medtronic, Inc. v. Catalyst Res. Corp.</u>, 547 F. Supp. 401, 415 (D. Minn. 1982) ("The most persuasive evidence of what a willing buyer and willing seller would agree to consists of the two existing agreements between [the defendant] and [two third-parties], and the terms that [the defendant] had actually proposed to [the plaintiff]. The two existing licenses do not constitute an established royalty [because they arose from litigation], but these agreements are highly persuasive evidence [of a reasonable royalty], absent some indication that the rate is artificially low." (internal citations omitted)), <u>with, e.g.</u>, <u>General Elec. Co. v. DR Sys., Inc.</u>, No. 06-5581(LDW)(ARL), 2007 WL 1791677, at *2 (E.D.N.Y. June 20, 2007) (unpublished) ("[S]ettlement agreements reached to resolve litigation or threatened litigation are

generally not relevant to the issue of what may constitute a reasonable royalty."); <u>Donnelly Corp. v. Gentex Corp.</u>, 918 F. Supp. 1126, 1133-34 (W.D. Mich. 1996) (ruling that "settlement agreements should be precluded under Federal Rule of Evidence 403," in part because their royalty rates "do not accurately reflect what a willing licensee would pay a willing licensor in an arm's length negotiation"); <u>Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.</u>, 860 F. Supp. 1448, 1452 (C.D. Cal. 1993) ("It is a century-old rule that royalties paid to avoid litigation are not a reliable indicator of the value of a patent, and should therefore be disregarded when determining reasonable royalty rates.").[9]

In evaluating the foregoing, pre-<u>ResQNet.com</u> body of case law, the Court would have concluded that VMI had not carried its burden of showing that, for purposes of Rule 26(b)(1), the requested settlement agreements lacked relevance to the reasonable royalty issue for at least three reasons. First, the above-cited cases that deemed such evidence irrelevant – on which VMI has relied in its briefs (<u>see</u> Docket Entry 363 at 3 (quoting <u>Donnelly</u> and <u>Wang Labs.</u>); Docket Entry 402 at 1, 5 (quoting <u>Wang Labs.</u>, <u>Donnelly</u>, and <u>General Elec.</u>))[10] – all reached that result based on the same

_____

[9] VMI cited the above-listed <u>Wang Labs.</u> decision as having been affirmed by the Federal Circuit. (<u>See</u> Docket Entry 402 at 1.) In fact, the Federal Circuit decision referenced by VMI did not address the district court ruling in question, but rather (as its introductory paragraph expressly states) affirmed two entirely different decisions by the district court. <u>See</u> <u>Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.</u>, 103 F.3d 1571 (Fed. Cir. 1997).

[10] VMI identified three other pre-<u>ResQNet.com</u> district court decisions as support for its position. (<u>See</u> Docket Entry 402 at 5-6.) However, the very language of those three cases (quoted by VMI) contradicts VMI's contention that
(continued...)

-27-

reading of <u>Rude</u> and <u>Hanson</u> that VMI has proposed; for reasons previously discussed, <u>see</u> <u>supra</u>, pp. 15-22, this Court has found such interpretations of <u>Rude</u> and <u>Hanson</u> unsustainable. Second, <u>Georgia-Pacific</u> Factors 4, 12, 14, and 15 (set forth above, <u>see</u> <u>supra</u>, p. 13-14) appear broad enough to encompass information regarding licenses agreed upon in settlement of litigation.

Indeed, the very multi-factorial design of the "hypothetical negotiation" approach suggests that the default perspective in this context would favor consideration of more, not less information (thus increasing the likelihood that evidence of this sort would qualify as relevant, at least at the discovery stage). Third, as previously discussed, <u>see</u> <u>supra</u>, pp. 24-25, the Federal Circuit's "reasonable royalty" review in <u>Deere</u> (which trumps any district court decision on the subject) supports the view that licenses for a patent in-suit granted in settlement of litigation generally are "relevant" within the meaning of Federal Rule of Evidence 402, although, under the distinctive facts of a particular case, a district court properly may attribute little weight to such evidence in rendering judgment regarding a reasonable royalty. Given that perspective on relevance <u>at trial</u>, the Court concludes that, in general, such settlement-derived licenses are relevant to the question of a reasonable royalty <u>at the discovery stage</u>. <u>See</u>

---

[10](...continued)
licenses granted in settlement of litigation lack <u>any</u> relevance to the determination of a reasonable royalty; instead, said decisions stand for the far less sweeping proposition that such licenses generally have <u>limited</u> relevance to the calculation of a reasonable royalty because the desire to avoid litigation (rather than the patent's value) may have affected the royalty price.

-28-

generally Truswal Sys., 813 F.2d at 1211 ("Relevance under Rule 26(b)(1) is construed more broadly for discovery than for trial.").

The Federal Circuit's recent ruling in ResQNet.com confirms the Court's conclusion on this point. In that case, "[t]he [district] court awarded damages of $506,305 for past infringement based on a hypothetical royalty of 12.5% . . . ." ResQNet.com, 594 F.3d at 863. The defendant "challenge[d] the methodology used by [the plaintiff's] damages expert . . . in determining this reasonable royalty." Id. at 868. In considering said challenge, the Federal Circuit repeated its prior observation that "'[d]etermining a fair and reasonable royalty is often . . . a difficult judicial chore, seeming often to involve more the talents of a conjurer than those of a judge.'" Id. at 869 (quoting Fromson v. Western Litho Plate & Supply Co., 853 F.2d 1568, 1574 (Fed. Cir. 1988)) (ellipses in original). However, the Federal Circuit emphasized that, when a district court looked to other license agreements as part of the "hypothetical negotiation" method of reasonable royalty calculation, it must not rely on agreements "radically different from the hypothetical agreement under consideration" and must "exercise vigilance when considering past licenses to technologies other than the patent in suit." Id. (internal quotation marks omitted).

According to the ResQNet.com Court, the plaintiff's expert had "based his damages [calculation] on seven . . . licenses [granted by the plaintiff], five of which had no relation to the claimed

invention." Id. at 870.[11] "The rates in [those five] licenses [we]re not consistent at all with the other two licenses in the record . . . [which both] arose out of litigation over the patents in suit." Id. The two litigation-spawned licenses consisted of: 1) a "lump-sum payment of stock which [the plaintiff's expert] was unable to analogize to a running royalty rate," id.; and 2) "an ongoing rate averaging substantially less than 12.5%," id. "In his own words, [the plaintiff's expert] recommended a rate for his hypothetical negotiation 'somewhere in the middle' of the [five unrelated] licenses and the [one] straight rate-based license [that resulted from a settlement]. He considered a few of the other Georgia-Pacific factors, but dismissed them because '[f]or the most part, the other factors have no real impact here.'" Id. (internal citations omitted) (final set of brackets in original). As a result, the plaintiff's expert "calculated that a mid-range of 12.5% was the appropriate royalty rate." Id.

From these facts, the Federal Circuit concluded that the plaintiff's expert had "used unrelated licenses . . . that had a rate nearly eight times greater than the straight license on the claimed technology . . . to push the royalty [rate] up into double figures." Id. It condemned this methodology and the district court's acceptance of the resulting royalty rate calculation. See id. at 870-72. In addition, the Federal Circuit rebuked the district court for "hav[ing] been heavily influenced by [the

---

[11] "[N]one of these [five] licenses even mentioned the patents in suit or showed any other discernible link to [them]." ResQNet.com, 594 F.3d at 870.

defendant's] decision to offer no expert testimony to counter [the plaintiff's expert's] opinion." Id. at 872. In so doing, the ResQNet.com Court stated that the district court "should not [have] sustain[ed] a royalty award based on inapposite licenses simply because [the defendant] did not proffer an expert" and pointed out that "the record already contained evidence of licenses on the claimed technology. [The defendant] was entitled to rely on that record evidence to show a royalty rate reasonably related to the technology in this litigation." Id. (emphasis added).

With that statement, the Federal Circuit expressly declared that the two licenses that arose from litigation provided a potential proper basis for a determination of the reasonable royalty. It, however, qualified that declaration as follows:

> [T]he most reliable license in this record arose out of litigation. On other occasions, this court has acknowledged that the hypothetical reasonable royalty calculation occurs before litigation and that litigation itself can skew the results of the hypothetical negotiation. Similarly this court has long recognized that a reasonable royalty can be different than a given royalty when, for example, widespread infringement artificially depressed past licenses. And a reasonable royalty may permissibly reflect the fact that an infringer had to be ordered by a court to pay damages, rather than agreeing to a reasonable royalty.

Id. (internal brackets, citations, and quotation marks omitted). The Federal Circuit then remanded the case so the district court could "reconsider the reasonable royalty . . . [including by] consider[ing] the panoply of events and facts that . . . could not have been known to or predicted by the hypothesized negotiators . . . [but without] rely[ing] on unrelated licenses to increase the

reasonable royalty rate above rates more clearly linked to the economic demand for the [patent in-suit]." Id. at 872-73.

Simply put, the Federal Circuit's ruling in ResQNet.com forecloses VMI's categorical contention that "[a]greements reached to resolve patent litigation are not relevant to the calculation of a reasonable royalty" (Docket Entry 363 at 6; accord Docket Entry 402 at 4). The vast majority of courts to consider the relevance of settlement agreements (and offers) to the subject of patent damages in light of ResQNet.com have reached the same conclusion about said decision's meaning and import. See Pandora Jewelry, LLC v. Bajul Imports, Inc., No. 1:10CV135SNLJ, 2011 WL 976623, at *1 (E.D. Mo. Mar. 17, 2011) (unpublished); MSTG, Inc. v. AT & T Mobility LLC, No. 08C7411, 2011 WL 841437, at *3 (N.D. Ill. Mar. 8, 2011) (unpublished); ePlus, Inc. v. Lawson Software, Inc., ___ F. Supp. 2d ___, ___, 2011 WL 250671, at *5 (E.D. Va. 2011); Clear With Computers, LLC v. Bergdorf Goodman, Inc., 753 F. Supp. 2d 662, 663-64 (E.D. Tex. 2010); ReedHycalog UK, Ltd. v. Diamond Innovations Inc., 727 F. Supp. 2d 543, 546-47 (E.D. Tex. 2010); Datatreasury Corp. v. Wells Fargo & Co., No. 2:06CV72DF, 2010 WL 903259, at *1-2 (E.D. Tex. Mar. 4, 2010) (unpublished); Tyco Healthcare Grp. LP v. E-Z-EM, Inc., No. 2:07CV262(TJW), 2010 WL 774878, at *2 (E.D. Tex. Mar. 2, 2010) (unpublished); but see Software Tree, LLC v. Red Hat, Inc., No. 6:09CV097, 2010 WL 2788202, at *3 (E.D. Tex. June 24, 2010) (unpublished); Fenner Invs., Ltd. v. Hewlett-Packard Co., No. 6:08CV273, 2010 WL 1727916, at *3 (E.D. Tex. Apr. 28, 2010) (unpublished).

Finally, VMI has offered no argument that anything about the particular licensing arrangements contained in its settlement agreements with the GE entities and Medison renders them irrelevant to the reasonable royalty calculation in this case; instead, VMI has relied on its faulty, blanket assertion that licenses arising from settlement agreements generally lack any relevance to a reasonable royalty determination. (See Docket Entry 363 at 6-7; Docket Entry 402 at 4-7.) Under these circumstances, VMI has failed to carry its burden of persuading the Court to deny Siemens's instant Motions to Compel on relevance grounds.

### 2. VMI Has Not Shown a Disproportionate or Undue Burden Would Result from Disclosure of the Requested Settlement Agreements

As detailed above, see supra, pp. 4-6, even if lack of relevance does not bar disclosure of the requested settlement agreements, VMI still could overcome Siemens's instant Motions to Compel, if VMI showed that the harm it would suffer from the disclosure outweighed the legitimate benefits of such disclosure or that such disclosure otherwise imposed an "undue burden," see Fed. R. Civ. P. 26(b)(1), (b)(2)(C), and (c)(1). Although VMI's briefs do not utilize the foregoing procedural framework, they do include an argument that fits within it; specifically, VMI complains that, if the Court grants Siemens's instant Motions to Compel, Siemens will "obtain[] information that might impact [Siemens's] negotiating position for any settlement with VMI" (Docket Entry 363 at 8; accord Docket Entry 402 at 10). In other words, VMI knows the terms of its settlements with the GE entities and Medison, but Siemens does not. This asymmetry of information gives VMI a

-33-

tactical advantage over Siemens in their settlement negotiations, which VMI will lose if the Court grants Siemens's instant Motions to Compel. The Court therefore must determine whether VMI has shown that:

1) VMI's interest in maintaining its foregoing negotiating edge outstrips the legitimate benefit that will accrue to Siemens in obtaining information from the settlement agreements relevant to the calculation of a reasonable royalty; or

2) VMI's loss of its superior bargaining position otherwise constitutes an undue burden.

The Court concludes that VMI has failed to carry its burden in this regard for a number of reasons. First, VMI has not shown that losing its asymmetrical knowledge advantage will work an injustice. As a respected jurist has observed in an analogous context, the interpretation of court rules in a manner that leads to "uniform treatment of similarly situated parties promotes settlement and justice too." Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig., 831 F. Supp. 1354, 1379 (N.D. Ill. 1993) (Easterbrook, J., sitting by designation) (reiterating that evidence of licenses taken in settlement of litigation was properly admitted at trial), aff'd on other grounds, 71 F.3d 1573 (Fed. Cir. 1995). Further, although (as recognized in authority previously discussed, see supra, pp. 22-28 & n.10, 31) in some cases litigation-induced licenses may have limited relevance to the determination of a reasonable royalty, VMI has not demonstrated that the settlement agreements at issue here fit that description.

For example, a settlement license may lack significant
probative value in the reasonable royalty calculus if the record
contains other comparable, non-settlement licenses.[12] Conversely,
if few (or no) licenses of the latter sort exist, licenses from
settlements may serve a more useful (or even necessary) function in
the "hypothetical negotiation" analysis. VMI has not made any
showing about what more reliable, alternative sources of
information might exist for the reasonable royalty determination in
this case. Accordingly, at this stage, the Court cannot say that
any licensing arrangement to which VMI agreed with the GE entities
and Medison ultimately will have little relevance to the
calculation of a reasonable royalty in this case.

Finally, the authority (discussed above, see supra, pp. 22-28
& n.10, 31) that supports the discounting of the evidentiary value
of a license secured in a settlement does so because of the fear
that avoidance of litigation costs and risk-management concerns –

---

[12] At least one notable authority has called into question this notion by
suggesting that the same cross-currents that may influence the payment of a
royalty in settlement of litigation come into play in licensing negotiations that
transpire outside of litigation:

> The settlement of patent litigation may be functionally identical to
> a license . . . . I recognize that people may settle patent
> litigation to reduce the costs of the legal process. The terms of
> a settlement reflect these costs as well as the parties' estimates
> about the probable outcome on the merits if the case proceeds. It
> is risky to use the parties' predictions as a reason to decide some
> other case on the merits. Yet deciding whether to take a license
> entails a similar assessment of the risks posed by litigation –
> prediction and avoidance of costs before suit begins – and it is
> settled that licenses are admissible . . . .

Matter of Mahurkar, 831 F. Supp. at 1378-79 (Easterbrook, J., sitting by
designation).

rather than the legitimate value of the patent to the user – may have driven the royalty price to which the settling parties agreed. VMI, however, has not shown how those litigation-related incentives may have affected the licensing arrangements it made with the GE entities and Medison. Nor can the Court readily discern how any such influences may have artificially reduced the agreed-upon royalties, such that their consideration as part of the "hypothetical negotiation" calculus would prejudice VMI; indeed, some plausible scenarios suggest the opposite.

The GE entities and Medison knew they could "get out" of this case by settling, and thereby avoid any further litigation costs, as well as the risk of a larger damage award. Those parties thus might have had an incentive to pay some sort of premium above the actual value they placed on the use of the patents in-suit to settle the case. On the other hand, in considering settlement with the GE entities and Medison, VMI knew the case would continue as to Siemens and Toshiba and thus that VMI would achieve only a marginal reduction in its litigation costs. At the same time, through such settlement, VMI had to relinquish its chance to secure a larger damage award against the GE entities and Medison. VMI therefore had an incentive to seek a premium above the value the GE entities and Medison actually placed on the patents in-suit before agreeing that the GE entities and Medison could "get out" of the case.

These circumstances do not suggest that the particular settlement pressures at play in this case depressed the royalty the GE entities and Medison agreed to pay VMI below the price the

parties would have negotiated at arms-length prior to litigation. At a minimum, in the absence of some further explanation from VMI on this point, the Court cannot find that any license VMI granted to the GE entities and Medison would have little value in the assessment of a reasonable royalty rate. In sum, VMI has not shown that the disclosure of the settlement agreements in question will cause an undue burden or a burden disproportionate to the legitimate utility such information might hold as to the calculation of a reasonable royalty.

D.  VMI Must Show Cause Why It Should Not Pay Reasonable Expenses Siemens Incurred in Connection with the Instant Motions to Compel

"Rule 37 provides generally for sanctions against parties or persons unjustifiably resisting discovery." Fed. R. Civ. P. 37 advisory committee's notes, 1970 Amendment.  More specifically:

> If the motion is granted – or if the disclosure or requested discovery is provided after the motion was filed – the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees.  But the court must not order this payment if:
>
> (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;
>
> (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or
>
> (iii) other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(5)(A).  See also Biovail Corp. v. Mylan Labs., Inc., 217 F.R.D. 380, 382 (N.D.W. Va. 2003) ("'The great

operative principle of [Rule 37] is that the loser pays.'" (quoting Rickels v. City of South Bend, 33 F.3d 785, 786 (7th Cir. 1994))).

In light of this standard, the Court will direct VMI to show cause why it should not have to pay the reasonable expenses Siemens incurred in litigating the instant Motions to Compel.

### E. To the Extent Toshiba's "Joinder" Filing Constitutes a Motion Requiring a Ruling, the Court Denies Any Relief

As noted in the Background section, see supra, p. 3, after the completion of all briefing on Siemens's instant Motions to Compel, Toshiba filed a "Joinder in Siemens' Motions to Compel Production of VMI's Settlement and License Agreements with Former Defendants GE and Medison" (Docket Entry 418). Both the title and contents of said filing appear more like a notice than a motion. (See id. at 1 (styling filing as "Joinder" rather than "Motion" and declaring that Toshiba "hereby joins in" Siemens's instant Motions to Compel).) Moreover, the "Joinder" expressly seeks relief only as follows: "[Toshiba] accordingly requests that Siemens' Motions be granted on the grounds set forth therein." (Id. at 2.)

However, Toshiba's "Joinder" also states that "[t]he basis for this joinder is the fact that [Toshiba] is similarly situated to Siemens with respect to VMI's claims, and VMI's settlement and license agreements with former defendants GE and Medison are highly relevant to this case for rebutting VMI's validity assertions and its damages assertions against [Toshiba]." (Id.) One might interpret this statement as an implied request that the Court order VMI to produce the settlement agreements in question to Toshiba. If Toshiba sought such relief, it should have filed a motion in

-38-

which it made its request clear. See Fed. R. Civ. P. 7(b)(1). Further, in that motion, Toshiba should have set out the basis for the Court to grant the requested relief. See id. Simply joining in Siemens's prior filings does not provide such a basis; for example, although Siemens included an exhibit showing that it had made document requests to VMI during discovery that encompassed the settlement agreements as to which it sought disclosure (see Docket Entry 362, Ex. A at 6-7), neither Siemens's filings nor Toshiba's "Joinder" contain any such documentation regarding similar document requests by Toshiba (see Docket Entries 362, 398, 418).

Under these circumstances, to the extent Toshiba's instant "Joinder" constitutes a motion requiring a ruling, the Court will deny any relief.

### III. CONCLUSION

As the party opposing disclosure, VMI bears the burden of persuading the Court that VMI's settlement agreements with the GE entities and Medison lack relevance to any issue in this case or that disclosure of said agreements would impose a disproportionate or otherwise undue burden on VMI. VMI has failed to show that the requested settlement agreements lack any relevance (within the meaning of Rule 26(b)(1)) to the calculation of a reasonable royalty in this case, particularly in light of the Federal Circuit's recent ruling in ResQNet.com. Nor has VMI persuaded the Court that the disclosure of said agreements to Siemens would disproportionately or unduly harm VMI. The Court therefore will compel VMI to disclose its settlement agreements with the GE

entities and Medison to Siemens.[13] However, because Toshiba neither has shown that it ever made a proper discovery request for the settlement agreements in question nor has filed a proper motion to compel, the Court declines to require VMI to make any such production to Toshiba.

**IT IS THEREFORE ORDERED** that Siemens's Motions to Compel (Docket Entries 361, 398) are **GRANTED** and that VMI shall forthwith produce to Siemens VMI's settlement agreements with the GE entities and Medison.

**IT IS FURTHER ORDERED** that:

1) on or before July 11, 2011, Siemens shall serve VMI with a statement setting out the reasonable expenses, including attorney's fees, Siemens incurred in connection with its instant Motions to Compel (with such expenses broken out separately for each such Motion to the extent practicable);

2) on or before August 1, 2011, VMI shall file a memorandum of not more than 10 pages showing cause why the Court should not require VMI to pay Siemens's reasonable expenses, including attorney's fees, and shall include in said memorandum any objections VMI wishes to present regarding the reasonableness of the expenses reported to it by Siemens, along with a certification

---

[13] As noted in the Background section, see supra, p. 2-3, Siemens also has contended that the settlement agreements in question bore relevance to the issue of patent validity. Because a sufficient basis exists for the Court to grant Siemens's instant Motions to Compel without addressing this alternative subject, the Court will not delve into it, but will note that other courts have ruled settlement agreements relevant to such matters (both for discovery and trial purposes). See, e.g., Wyeth v. Orgenus Pharma Inc., Civil Action No. 09-3235(FLW), 2010 WL 4117157, at *1-4 (D.N.J. Oct. 19, 2010) (unpublished); Matter of Mahurkar, 831 F. Supp. at 1378-79.

that it has made reasonable efforts to meet and to confer in good faith with Siemens about such objections;

3) on or before August 22, 2011, Siemens may file a response of no more than 10 pages to VMI's foregoing memorandum; and

4) on or before September 1, 2011, VMI may file a reply of not more than five pages to any response filed by Siemens.

**IT IS FURTHER ORDERED** that, to the extent Toshiba's "Joinder in Siemens' Motions to Compel Production of VMI's Settlement and License Agreements with Former Defendants GE and Medison" (Docket Entry 418) constitutes a motion requiring a ruling, it is **DENIED**.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

June 20, 2011